IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  5:15CR46 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| JAMES VAN BUSKIRK, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Steven M. Dettelbach, United States Attorney, and Matthew J. Cronin, Assistant United States Attorney, hereby respectfully submits this sentencing memorandum establishing the appropriate offense level under the advisory Guidelines.[1]  Defendant obtained $345,755.99 in federal and state benefits to which he was not entitled through a multi-year benefits fraud scheme.  After a thorough investigation, both the Social Security Administration and the Ohio Bureau of Worker's Compensation correctly found that Defendant was not entitled to any of these benefits.  The appropriate loss amount is thus $345,755.99, resulting in an offense level of 19 before contemplating Defendant's acceptance of responsibility.  *See* U.S.S.G. §§ 2B1.1(a)(1), (b)(1)(G).

---

[1] The United States files this sentencing memorandum in response to Defendant's objection to the Count 1 loss amounts as stated in the July 31, 2015 Final PSR filed late last Friday and statements in his motion for a continuance this week that he may still contest the loss amount.  This memorandum does not include reference to any new facts or law.  The exhibits are materials Defendant has had in his possession pursuant to discovery since March 2015.  The law is well established within this Circuit.

1

## Factual Background

### A. Procedural History

On February 3, 2015, a federal Grand Jury charged Defendant James Van Buskirk in an eleven-count indictment, alleging that Defendant fraudulently received federal and state benefits by purposely concealing his work activity that rendered him ineligible for these benefits. Specifically, Count 1 alleged that Defendant stole and converted to his own use $75,823.00 in Social Security Title II Disability Benefits; Counts 2-10 alleged that Defendant committed wire fraud resulting in a $269,932.99 loss to the Ohio Bureau of Worker's Compensation (OBWC); and Count 11 alleged that Defendant concealed and failed to disclose his self-employment and work from Social Security in order to continue to receive benefits to which he was not entitled.

On April 30, 2015, Defendant pled guilty to all counts in the indictment. On July 31, 2015, the Final PSR noted Defendant's objection to the $75,823 loss amount in Count 1. (Final PSR, page 21).

### B. Factual Basis

Defendant began receiving disability benefits from OBWC on November 20, 2002 based on an alleged September 3, 2002 back injury. He applied for Social Security Title II Disability benefits on January 6, 2005 based on the same alleged back disability. The Social Security Administration (SSA) initially denied his claim. Defendant appealed this decision to SSA Administrative Law Judge Edmund Round. On May 6, 2008, Defendant testified under oath at an administrative hearing before this judge that he was disabled and that had not worked since he injured his back on September 3, 2002. As a result, the administrative law judge found Defendant to be disabled and entitled to all benefits.

The OBWC Special Investigations Department began investigating Defendant on March 14, 2011 after a confidential source stated that Defendant had worked on numerous construction

jobs while receiving federal and state disability benefits. The source stated that Defendant had operated his own construction company called S&J Construction[2] since at least 2002, the year of his alleged back injury. Both OBWC and Social Security require that an individual receiving the relevant disability benefits be unable to work due to the injury and report any work while receiving benefits to the respective agencies. Both Defendant's work and his failure to report this work would therefore render him ineligible for the state and federal disability benefits he was receiving.[3]

After initially looking into the source's claims, OBWC consulted with the SSA Office of Inspector General (SSA-OIG), which joined the investigation. Ultimately, the joint investigation verified that Defendant engaged in a long-term benefits fraud scheme from around November 2002 to April 2014.

The heart of the scheme involved Defendant applying for and receiving SSA and OBWC disability benefits while simultaneously working and not informing either agency of that fact, which is in direct violation of SSA and OBWC requirements, thus rendering him wholly

---

[2] The confidential source indicated that "S&J" stood for Sonja and James, Defendant's wife's and his own first names.

[3] Disability is defined under sections 216(i) and 223(d) of the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." In particular, the Social Security Act states that "**[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work** which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." Social Security Act, § 223(d)(1)(A), (d)(2)(A) (emphasis added).

Similarly, Ohio Administrative Code § 4121-3-32(B)(1)(a) states that temporary total disability compensation (the form of disability payments Defendant applied for and received) may be terminated when the employee "**returns to work**."

Defendant also received notices several times a year informing him that he had an affirmative duty to inform the respective agencies of any work he performed, as it would affect his benefits.

ineligible for the federal and state benefits.  The over a decade-long scheme resulted in Defendant receiving a total of $345,755.99 in benefits to which he was not entitled.

The multi-year joint investigation uncovered numerous and exhaustive evidence of Defendant's ongoing fraud.  As examples, this evidence included:

1. Dozens of interviews with Defendant's customers, who provided investigators with detailed accounts of Defendant's work from 2002-2013, photos of Defendant working, and Defendant's flyers and business cards.  (*See, e.g.*, Gov. Ex. 1 (Memorandum of Interview Relating to 2007 Construction Project, including pictures and recitation of Defendant working on the roof));

2. Third party records establishing Defendant's work history, such as receipts from 2002-2013 showing Defendant buying construction equipment.  (*See, e.g.*, Gov. Ex. 2: Defendant's Receipts for Construction Equipment and Materials Purchases);

3. Surveillance videos of Defendant working on various job sites performing strenuous physical tasks, such as installing new siding, roofing, and windows, going up and down ladders, and carrying heavy objects.  (*See, e.g.*, Gov. Ex. 3: 2012 Surveillance Log (observing Defendant "climbing up/down ladders, bending, lifting heavy objects, working with various construction tools" and performing scaffolding and other work));

4. Defendant's admissions in other contexts, such as police reports and other forms, where Defendant stated he was employed.  (*See, e.g.*, Gov. Ex. 4: 2010 Police Report, p. 8 (Defendant admitting to police he worked for a construction company)); and

5. Numerous court records where Defendant either was sued for faulty work or sued his customers for non-payment, including cases where Defendant testified under oath

>regarding construction work he performed.  (*See, e.g.*, Gov. Ex. 5: Defendant's 2010 Civil Suit, p. 34 (Defendant explaining in interrogatory answer that he was a "union carpenter for 28 years" and conducted significant heavy labor for civil defendant, including "remov[ing] floor, install[ing] new one")).

The investigation also uncovered attempts by Defendant to conceal his work.  Customers reported that he consistently requested that they pay him in cash.  When Defendant was not paid in cash, he many times would not deposit the check into his own bank account, but instead go to the issuing bank and cash the check there, thereafter depositing the cash into his own bank account.  Defendant and his construction company were also sometimes hired as a subcontractor by other construction firms.  Some contractors would require subcontractors to provide Social Security numbers so that a Form 1099 could be lawfully issued to them.  In those instances, Defendant provided his wife's Social Security number, thereby preventing the wages to be reported to him.  (*See, e.g.*, Gov. Ex. 6 (Contractor Records)).

Investigators ultimately confronted Defendant on August 28, 2013 while he was working on a construction site.  While Defendant provided different and contradictory answers as to when he returned to work, he admitted that he (1) understood that he was not permitted to work while receiving disability benefits and (2) failed to notify both SSA and OBWC about his work.  (Gov. Ex. 7: Van Buskirk Interview).

**C.    Federal and State Authorities Find Defendant Committed Fraud and was Not Entitled to Any Benefits He had Received**

As a result of this investigation, both the SSA and OBWC independently found that Defendant was ineligible for any benefits during this period.  In July 2014, Administrative Law Judge Round found that, while in 2008 "Mr. Van Buskirk denied that he had worked since September 2002[,] I now conclude that he lied."  (Gov. Ex. 8: Opinion of SSA Administrative

5

Law Judge Round) (finding that the investigation was "well researched and painstakingly documented"). The Judge thus held that "**Mr. Van Buskirk was NOT under a disability within the meaning of the Social Security Act at any time on or after September 3, 2002**" and reversed his 2008 opinion, finding that Defendant obtained this earlier result through "fraud or similar fault." (*Id.*) (emphasis added). In his opinion, ALJ Round noted that Defendant admitted at the July 7, 2014 hearing that he had started and worked at his construction company after his September 2002 injury:

> At the July 7, 2014 hearing, I asked Mr. Van Buskirk whether he had worked after September 3, 2002. He said he had started his own construction company after September 3, 2002. He said that he did not work full time, but only when the company had work. In response to my question, he admitted that that was the nature of construction work – one works only when there is a project to work on. Although he said at first that the work he did was "paper pushing," he later said that he did some physical work on construction projects. He said that his earnings were within Social Security "guidelines." All of this is contrary to his testimony at the 2008 hearing, which was that he did not work at all.

(*Id.*) The ALJ also noted the extensive evidence demonstrating that Defendant "worked alone, without helpers" on the construction jobs. (*Id.*) The Judge likewise found that Defendant did not report his income:

> Also at the July 7, 2014 hearing, I asked Mr. Van Buskirk whether he had filed income tax returns during this time period and he said that he had. Two pieces of evidence lead me to conclude that that is also a lie. First, Special Agent Altman testified that that joint BWC/OIG investigation had not found any income tax returns, either for Mr. Van Buskirk personally or for his company, nor did it find evidence that the company had registered to do business in the State of Ohio. Second, Mr. Van Buskirk's earnings record (Exhibit 5D) shows minimal earnings of $2,992.45 in 2003 and no earnings at all in 2004 through 2012. Had he actually filed income tax returns, his income would have been recorded on his earnings record.

(*Id.*) (noting that Defendant had made a minimum of $214,000 from his construction work during the relevant period). Finding that the investigation into Defendant's fraud was "well

6

researched and painstakingly documented," the ALJ held that Defendant "was engaged in substantial gainful activity" and thus was not entitled to benefits.  (*Id.*)

Defendant committed this fraud despite SSA sending frequent warnings to him that he may face criminal charges if he fails to notify SSA of any work or other changes that could affect his entitlement.  Defendant even acknowledged in his own 2005 disability application that he had an affirmative obligation to notify SSA "if my medical condition improves so that I would be able to return to work, even though I have not yet returned to work," and "if I go to work whether as an employee or a self-employed person."  (Gov. Ex. 9: Defendant's Application for SSA Disability Benefits).

The Ohio Industrial Commission, which oversees OBWC's benefits disbursements, reached the same result on May 8, 2014.  The Commission based its result in part on the voluminous evidence demonstrating Defendant's work:

> For each of the years from 2002 through 2013 this file contains evidence of material purchases, individual job and home improvement arrangements with various home owners, home owner's statements with regard to this Injured Worker performing work at their home, a transcript from a Common Pleas Court proceeding with the Injured Worker making admissions of his employment, the use of both the Injured Worker's Wife's Social Security number as well as his Father's Social Security number in the cashing of checks, many cash deposits into the account of the Injured Worker over these years as well as various court proceedings where the Injured Worker sued homeowners for not paying him as agreed for the construction work that he performed during the periods he was receiving temporary total disability compensation.

(Gov. Ex. 10: Ohio Industrial Commission May 8, 2014 Decision).  This evidence is in addition materials demonstrating that (a) "the Injured Worker was advised that it was necessary for him to notify the Bureau of Workers' Compensation if he performed any type of work during the periods he was receiving temporary total disability compensation;" (b) "that the Injured Worker was a subcontractor/independent contractor for several businesses including S&J Construction as

well as Miller Construction;" and (c) conclusive evidence of Defendant's physical work on sites, including "video surveillance clips in 2013 which showed the Injured Worker performing siding jobs for a contractor and he was personally performing the work.  When he received payment for one of the surveillance jobs and received a check he used his Father's Social Security number to obtain the funds." (*Id.*)  The Commission further found that Defendant never informed OBWC of his work, despite "numerous notices" advising Defendant that "it was necessary for him to notify the Bureau of Workers' Compensation if he performed any type of work." (*Id.*; *See ,e.g.*, Gov. Ex. 11: ACT Enrollment Direct Deposit Authorization (warning Defendant that "[i]f your payments under this authorization are to compensate you for total disability, you are not entitled to these payments if you are working.  Working includes full or part-time employment" and failure to report may result in "felony criminal prosecution")).

Based on this evidence, the Commission terminated Defendant's benefits, finding that he had acquired them through fraud.  (*Id.*)  This prosecution followed.

## Law and Argument

A "sentencing judge 'is in a unique position to assess the evidence and estimate the loss based upon that evidence.'" *United States v. Josic*, 2009 WL 1035400, *5 (6th Cir. 2009) (unpublished) (quoting U.S.S.G. § 2B1.1 n. 3(C)).  As a fraud case, Defendant's loss calculation is controlled by U.S.S.G. § 2B1.1.  "In situations where the losses occasioned by financial frauds are not easy to quantify, the district court need only make a reasonable estimate of the loss, given the available information." *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006) (citing U.S.S.G. § 2B1.1 n.2 (C)); *accord United States v. Gray*, 521 F.3d 514, 542 (6th Cir. 2008).  "Such estimates need not be determined with precision.  *Id.*; *see also United States v. White*, 492 F.3d 380, 416 (6th Cir. 2007) ("[l]oss need not be determined with precision"); *Gray*, 521 F.3d at

543. "'In challenging the court's loss calculation, a defendant must carry the heavy burden of persuading [the Sixth Circuit] that the evaluation of the loss was not only inaccurate, but outside the realm of permissible calculations.'" *Id.* (quoting *United States v. Hamilton*, 263 F.3d 645, 654 (6th Cir. 2001) (internal brackets omitted)).

In benefits fraud cases, the Sixth Circuit has consistently held that a trial court can infer that a defendant engaged in work-related conduct throughout the relevant period by looking at various instances of work-related conduct. In *United States v. Stephens-Miller* – a case bearing striking similarities to the present matter – a defendant convicted of defrauding SSA and OBWC by working while receiving disability benefits challenged a district court's sentence finding that she worked throughout the relevant period. 582 Fed. Appx. 626 (6th Cir. 2014) (unpublished). At trial, the United States introduced evidence establishing that defendant worked during the relevant period, such as surveillance, testimony from eyewitnesses, and defendant's own statements to agents admitting she worked during that time. Defendant provided evidence that, while she did work, she did have serious health problems that sometimes prevented her from working. On appeal, defendant argued that the district court's finding that she worked continuously throughout that period must be overturned,

> because the stores were not open all day, every day throughout the twelve-year period, because the government did not conduct surveillance during the entire period, because she did not receive compensation for whatever work she did complete during that time, and because there was no expert testimony presented by the government to assess a monetary value to her conduct in the stores.

*Id.* at 644.

The Sixth Circuit rejected all of these arguments, finding that **"[t]he relevant consideration is whether Defendant was able to and did work during the time period, not whether she worked a full-time or part-time job**." *Id.* at 646 (emphasis added). Moreover,

9

the Sixth Circuit reiterated that a "sentencing judge need only make a reasonable estimate" based on the facts available to the court, including the discrete evidence establishing that Defendant worked at various times during the relevant period. *Id.* The Sixth Circuit likewise noted that the judge's sentence must be upheld unless it is "outside the universe of acceptable computations." *Id.* at 643 (citing *United States v. Fleming*, 128 F.3d 285, 287 (6th Cir. 1997)).  Based on that binding precedent, the Court held that,

> [a]lthough the government did not present evidence that Defendant worked every day during that twelve-year period, there was sufficient evidence for the court to find by a preponderance of the evidence that Defendant **was able to work from 1996 through 2008 and that this was not a one-day or a two-day kind of thing**, but it was something she did throughout the period."

*Id.* (internal quotations omitted) (emphasis added).

      The Sixth Circuit's analysis in *Stephens-Miller* applies with equal force here.  The joint SSA and OBWC investigation painstakingly detailed Defendant's ongoing fraud.  This evidence includes Defendant's own statements under oath in civil cases that he worked as a construction laborer, surveillance of Defendant working, statements by former customers establishing that he worked on their homes, statements by laborers who worked with or for Defendant on various construction projects, and Defendant's own admissions both to the agents and the SSA administrative law judge that he worked after his 2002 injury.  Defendant also never reported these events, in direct violation of his legal duties as a benefits recipient.  As SSA and OBWC each independently found, Defendant was not entitled to any benefits from either agency during that period under both federal and state law.[4]  Defendant thus gained a total of $345,755.99 in benefits to which he was not entitled.  That is the proper loss amount.

---

[4] Defendant intimates in his objections to the PSR that this Court should cut out certain periods of time when he purportedly was not working.  As the Court held in *Stephens-Miller*, that is not how the law works.  And that makes sense.  To hold otherwise would mean that federal agents would literally need exhaustive surveillance of every

10

Moreover, Defendant only objected in the PSR to the SSA loss of $75,823.  (Final PSR, Page 21).  Even if, *arguendo*, this Court in contradiction to law and fact found *no* loss under Count One, Defendant would still be above the $200,000 cutoff under U.S.S.G. § 2B1.1(b)(1)(G) and thus have no change in his offense level.

### Advisory Guidelines Computation

Under the advisory Guidelines, Defendant's base offense level is seven.  U.S.S.G. § 2B1.1(a)(1).  Defendant's loss amount results in an additional 12 points added to his offense level.  U.S.S.G. § 2B1.1(b)(1)(G).  Defendant's total offense level before acceptance is **19**.  If Defendant continues to accept responsibility and the United States (as it currently anticipates) moves for a third point for acceptance of responsibility, Defendant will have a total offense level of **16**.  According to Pretrial Services' Final Presentence Report, Defendant falls within criminal history category III.  If that is the case, Defendant's advisory Guideline range is **27-33 months** in Zone D.

### Conclusion

For the reasons set forth above, the United States respectfully requests that this Court sentence Defendant within the aforementioned advisory Guidelines range.

    Respectfully submitted,

    STEVEN M. DETTELBACH
    United States Attorney

By:   /s/ Matthew J. Cronin
    Matthew J. Cronin (VA: 80267)
    Assistant United States Attorney
    United States Attorney's Office
    801 West Superior Avenue, Suite 400
    Cleveland, OH 44113
    (216) 622-3955

---

possible instance where Defendant was working.  That interpretation not only defies the law, but also common sense.

11

(216) 522-2403 (facsimile)
Matthew.Cronin@usdoj.gov

CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing was filed electronically on August 6, 2015. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                              /s/ Matthew J. Cronin
                                              Matthew J. Cronin
                                              Assistant United States Attorney